# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

Nº 10-CV-3993 (JFB) (ARL)

———————————

GURNEY'S INN RESORT & SPA LTD.,

*Plaintiff,*

VERSUS

LINDA BENJAMIN, ET AL.,

*Defendants.*

———————————

**MEMORANDUM AND ORDER**
July 20, 2012

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Gurney's Inn Resort & Spa Ltd. ("plaintiff" or "Gurney's") commenced this action in New York State Supreme Court, Suffolk County against Linda Benjamin ("Benjamin"), Thomas Carusona ("Carusona"), and Christopher Bennett ("Bennett"), seeking a declaratory judgment to determine the respective rights of the members of Gurney's Board of Directors ("the Board"). This case is a corporate governance dispute over which shareholders have the right to control the Gurney's Board. In this lawsuit, plaintiff seeks to have the Court declare the rights and obligations of Gurney's two classes of shares, as well as resolve an internal, corporate governance dispute that arose after Benjamin was elected to Gurney's Board of Directors in 2009. Gurney's has three members on its Board. One director (Benjamin) was elected by Gurney's timeshare owners (who own the Class A stock), while two members (Carusona and Kearney) were elected by the Gurney's Inn Corp. Liquidating Trust (which owns the Class B stock). Since her election, Benjamin claims that Section 3(e) of Gurney's Interval Proprietary Lease gives her the authority to control all of Gurney's finances, services, and expenditures.

Benjamin removed the action to this Court. In a previous decision of this Court, the Court realigned Carusona and Bennett as plaintiffs in this matter.[1] Benjamin now

---

[1] Plaintiff also seeks leave to amend the verified complaint to substitute non-party John Kearney ("Kearney") as defendant in the place of Bennett because, on November 8, 2010, Bennett formally resigned from the Board of Directors of Gurney's and Kearney was duly elected as Bennett's successor. (Kearney Dec. ¶¶ 5-7.) In Benjamin's memorandum of law in opposition to plaintiff's motion for summary judgment, Benjamin states "[a]s to the second motion – leave to amend Gurney's complaint to substitute Class B directors – Benjamin takes no

moves to disqualify Gurney's counsel.  For the reasons discussed herein, that motion is without merit and is denied.

Gurney's separately moves for summary judgment and argues that each member of Gurney's Board, including Benjamin, has one equal vote concerning all matters considered by the Board, including financial decisions and whether to increase, reduce, change, modify or terminate services or expenditures at Gurney's.

For the reasons set forth below, the plaintiff's motion for summary judgment is granted.  Although Benjamin urges the Court to read Section 3(e) of the Lease in isolation to give her absolute control over Gurney's financial decisions, it is axiomatic under New York law that a cooperative corporation's governing documents should not be read in isolation.  When Gurney's organizational documents are read together, they unambiguously provide that each Board member has one, equal vote on all corporate matters.  Specifically, each of the organizational documents – namely, the Certificate of Amendment of the Certificate of Incorporation, the By-Laws, and the

_____

position.  Benjamin agrees with the reasoning behind the motion.  However, the motion was made in violation of this Court's rules as Gurney did not first submit a letter requesting a pre-motion conference. Moreover, in seeking to substitute defendants, Gurney's ignores this Court's prior holding which 'realigns Carusona and Bennett as plaintiffs in this matter.'  Gurney's Inn Resort & Spa Ltd. v. Benjamin, 743 F. Supp. 2d 117, 126 (E.D.N.Y. 2010)."  (Benjamin's Brief in Opposition to Gurney's Summary Judgment Motion ("Benj. SJ Opp. Br.") at 3.) At oral argument on March 7, 2012, counsel for Benjamin stated that he did not take a position on Gurney's motion to amend.  Accordingly, the Court waives the pre-motion conference requirement and permits Gurney's to amend the complaint to substitute Kearney in the place of Bennett. However, as with Bennett, Kearney is re-aligned as a plaintiff. By letter dated July 12, 2012, plaintiff's counsel confirmed that Kearney is a New York resident.

Offering Plan – all unambiguously support Gurney's interpretation of the corporate governance powers.   In fact, even other provisions of the Lease itself provide that the Board of Directors collectively determine Gurney's finances.  Moreover, the documents from the bankruptcy proceedings – including the Stipulation of Settlement between Gurney's and the Trust, the First Amended Plan of Reorganization, and the Order approving the First Amended Plan of Reorganization – similarly make clear that the Trust has the right to control Gurney's, through its election of the Board, until the Trust's purchase money mortgage is paid off in full.  Even assuming *arguendo* that an ambiguity exists in the corporate governance documents because of Section 3(e), the uncontroverted extrinsic evidence – including the opinion of the draftsman of the lease, the opinion of the draftsman of Gurney's Bankruptcy Reorganization Plan, and the 13-year course of performance prior to Benjamin's election – unequivocally demonstrates that the parties intended that the Class B shareholders would control Gurney's until the Class B shares are terminated.  Benjamin points to no extrinsic evidence to rebut this overwhelming showing by plaintiff.   Thus, since the extrinsic evidence is itself capable of only one interpretation, summary judgment in Gurney's favor is warranted even assuming *arguendo* that ambiguity in the corporate governance documents exists.  Accordingly, the Court grants Gurney's motion for summary judgment declaring that each member of Gurney's Board of Directors, including Benjamin, has one, equal vote concerning all matters considered by the Board, including financial decisions and whether to increase, reduce, change, modify or terminate services or expenditures at Gurney's until the Monremarano/Cooper Trust's mortgage (*i.e.,* the purchase money mortgage) is paid in full.

## I. BACKGROUND

### A. Facts

The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the parties' respective Rule 56.1 statements of facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005). Unless otherwise noted, where a party's 56.1 statement is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.[2]

#### 1.   Gurney's Organization

According to plaintiff, Gurney's is a hotel, spa and conference center located in Montauk, New York. (Pl. 56.1 ¶ 1.) Gurney's is a timeshare cooperative corporation that owns a hotel, spa and conference center. (Benj. 56.1 ¶ 1.) There are three members of Gurney's Board of Directors (the "Board"): Benjamin, Carusona and Kearney. (Pl. 56.1 ¶ 2.) At Board meetings, each member of the Board is entitled to one vote, and a vote of the majority of the Board present at a duly constituted meeting is required to pass a resolution of the Board. (*Id.* at ¶¶ 4-5.)

Gurney's has two classes of stock, Class A and Class B, and is authorized to issue 750,000 shares of Class A stock and 2,700,000 shares of Class B stock. (*Id.* ¶¶ 6-7.) According to plaintiff, at shareholder meetings the Class A and the Class B shares are entitled to one vote per share, the Class A shares are owned entirely by Gurney's timeshare owners and the Class B shares are owned entirely by the Gurney's Inn Corp. Liquidating Trust (the "Trust.") (*Id.* ¶¶ 8-10.) According to Benjamin, assuming matters are properly before all shareholders, all of the shareholders are entitled to one vote. (Benj. 56.1 ¶ 8.) Moreover, Benjamin contends the Unsold Shares Agreement gives the Trust a present interest in 61,240 Class A shares. (*Id.* ¶ 9.) In addition, Benjamin contends that the Class B shares have never been issued properly because no proper payment was received by Gurney's. (*Id.* ¶ 10.)

Plaintiff contends that the Class A shareholders are entitled to elect one member of the Board and the Class B shareholders are entitled to elect two members. (Pl. 56.1 ¶¶ 11, 12.) Plaintiff also states that Benjamin was duly elected to the Board by the Class A shareholders in 2009 and that Carusona and Kearney were duly-elected to the Board by Gurney's Class B shareholders. (*Id.* ¶¶ 13, 14.) Benjamin agrees that she was duly-elected in 2009 and that, assuming there is a three-person board, the Class A shareholders are entitled to elect one member of the Board. (Benj. 56.1 ¶¶ 11, 12.) However, because Benjamin contends that the Class B shares have never been issued properly, she does not agree that the Class B shareholders are entitled to elect two members of the Board, or that Carusona and Kearney were duly-elected. (*Id.* ¶ 14.)

#### 2.   Gurney's Conversion to a Timeshare Cooperative

Gurney's states that, in 1981, Gurney's was incorporated for the purpose of converting Gurney's predecessor-in-interest, Gurney's Inn Corp., to a timeshare. (Pl.

---

[2]In addition, although the parties' Rule 56.1 statements contain specific citations to the record to support their statements, the Court has cited to the Rule 56.1 statements, rather than the underlying citation to the record, when utilizing the 56.1 statements for purposes of this summary of facts.

56.1 ¶ 15.)  Benjamin states that Gurney's was not converted into a timeshare cooperative, but rather that Gurney's Inn Corp. sold its interest in the property to plaintiff and Gurney's Inn Corp. became the Trust.  (Benj. 56.1 ¶ 15.)  David Clurman ("Clurman") was Gurney's attorney for the timeshare conversion.  (Pl. 56.1 ¶ 16.)  The terms of the timeshare conversion were set forth in, among other documents, the Offering Plan and Interval Proprietary Lease (the "Lease").  (*Id*. at ¶ 17.) Pursuant to the Offering Plan, the timeshare subscribers were issued shares of Class A stock and, pursuant to the Lease, the Class A shareholders were issued leasehold interests entitling them to occupy timeshare units at Gurney's for specified weeks of the year.  (*Id*. ¶¶ 18, 19.)  Plaintiff avers that Clurman drafted the Offering Plan and Lease, presented them to the New York State Attorney General's Office for review and approval, and that the New York State Attorney General's office reviewed and approved the Offering Plan and the Lease and gave Gurney's permission to offer timeshare units for sale to the public.  (*Id*. ¶¶ 20-21.)  Benjamin disagrees and states that no government agency has approved the Offering Plan and that it is copyrighted by Clurman and George C. Stankevich.  (Benj. 56.1 ¶¶ 20-21.)  Gurney's timeshare offering commenced on May 15, 1982.  (*Id*. ¶ 22.)

### 3.  Senior Lenders

According to Gurney's, Gurney's converted to a timeshare, in part, to raise capital to pay off Gurney's Inn Corp.'s indebtedness to its senior lenders, which included among others, East River Savings Bank ("East River"), and the predecessor-in-interest to the Trust.[3]  (Pl. 56.1 ¶ 23.)  East

River and the Trust's predecessor demanded control over the Board until its loans were paid off in full as a condition to their consent to the timeshare offering.[4]  (*Id*. ¶ 24.)  According to Gurney's, East River and the Trust's control over Gurney's was achieved by, among other things, creating the two classes of stock, Class A and Class B, and by providing that the Class B shares, owned solely by East River and the Trust, had the right to elect all three members of the Board until full and complete payment of their loans.[5]  (*Id*. 25.)

### 4.  Gurney's Reorganization

Gurney's filed for Chapter 11 bankruptcy reorganization in 1994 after East River's successor-in-interest, HAC 1, Inc., attempted to foreclose on Gurney's property.  (Pl. 56.1 ¶ 26.)  Prior to the bankruptcy, Gurney's did not have a Class A director and the members of the Board were elected by Class B shareholders.  (*Id*. ¶ 27.)

Plaintiff asserts that, during the bankruptcy reorganization process, Gurney's and its largest creditors voluntarily agreed to give the timeshare owners/Class A shareholders a single seat on the Board.  (*Id*. ¶ 28.)  According to plaintiff, this seat was only given to allow them a vote on the Board and the parties did not intend to bestow the new Class A director with any special rights.[6]  (*Id*. ¶¶ 29-30.)  Benjamin

---

[3]  Benjamin disputes this fact because "[t]he corporation actually operating the resort property would not be considered a 'senior lender' under any

reasonable definition of the term."  (Benj. 56.1 ¶ 23.)
[4]  Benjamin disputes this fact because "[t]he citations relied upon by Gurney's appear to relate only to institutional lenders."  (Benj. 56.1 ¶ 24.)
[5]  Benjamin disputes this fact because "[t]he mere authorizing of a class of shares, without properly issuing same, does not provide legal control.  NYBCL § 504.  In addition, none of the citations establishes the right of the mortgagees to appoint all of the directors."  (Benj. 56.1 ¶ 25.)
[6]  Benjamin does not agree with this statement because "[i]n addition to being irrelevant, there is no proper citation for this item.  Mr. Montemarano's

contends that the creation of the seat on the Board was not voluntary because the Offering Plan only permitted mortgagees to control/appoint a majority of directors and that the only class of shares available to elect a minority director or directors was the Class A shares. (Benj. 56.1 ¶ 28.) Moreover, Benjamin contends that a director does more than vote. (*Id.* ¶ 29.)

In 1996, Edward Leggio ("Leggio") became the first Class A director on Gurney's Board and served in that position until he resigned in 2009 and was replaced by Benjamin. (Pl. 56.1 ¶ 31.) In 1998, Gurney's and the Trust entered into a Stipulation of Settlement in the bankruptcy proceeding (the "Stipulation of Settlement"), which the Bankruptcy Court approved in an Order dated November 3, 1998. (*Id.* ¶ 32.) The Stipulation of Settlement provided, in part, that:

> [T]he Trust agrees to amend Limited's[7] Offering Plan and Bylaws as follows: (a) Article III, Section 2 of the Bylaws of Limited will provide that one seat on the Board of Directors of Limited shall be elected by majority vote of the Class A Shareholders . . . The remaining two seats, shall be elected by majority vote of all Class B and Class A shareholders, of which all Class B shares are owned by the Liquidating Trust, possessing a controlling vote; (b) Paragraph 'N' of the Offering Plan to provide that only the purchase money mortgagee may appoint and control the Board of

Directors of Limited until the purchase mortgage is paid in full.

(*Id.* ¶ 33.) In 1999, Gurney's emerged from bankruptcy pursuant to a First Amended Plan of Reorganization (the "Plan"), which provided in part that:

> Article III, Section 2 of the Bylaws of Limited is amended to provide that one seat on the Board of the Directors of Limited shall be elected by majority vote of the Class A Shareholders . . . With the exception of Class A Shareholder member of the Board of Directors, all other Directors of the Board of Directors shall be appointed by the Purchase Money Mortgagee, until the Purchase Money Mortgage (as modified and restated) is paid in full.

(*Id.* ¶¶ 34-35.) Apart from creating the Class A directorship seat, the Plan did not alter or amend any of the respective pre-bankruptcy rights or powers of the three members of Gurney's Board.[8] (*Id.* ¶ 36.)

B. Procedural History.

On September 1, 2010, Benjamin removed this action from the Supreme Court of New York, Suffolk County. After Gurney's moved for remand, in a Memorandum and Order dated October 13, 2010, this Court denied Gurney's motion and realigned the parties so that Bennett and Carusona would be plaintiffs.

---

statement is hearsay and Mr. White improperly purports to instruct this Court on the law." (Benj. 56.1 ¶ 30.)
[7] Gurney's is sometimes referred to as "Limited" in the documents cited by Gurney's and Benjamin.

[8] Benjamin does not agree to this fact because the Class A directorship was "formally created" in the Offering Plan and the Offering Plan only permitted mortgagees to control/appoint a majority of directors and the only class of shares available to elect a minority director or directors was the Class A shares. (Benj. 56.1 ¶¶ 36, 28.)

On January 6, 2012, Gurney's filed its motion for summary judgment. On January 6, 2010, Carusona filed a declaration in support of Gurney's motion for summary judgment. On February 6, 2012, Benjamin filed opposition to Gurney's motion. On February 21, 2012, Gurney's filed its reply.

On January 6, 2012, Benjamin filed a motion under seal to disqualify counsel for Gurney's. Carusona and Gurney's both filed oppositions to Gurney's motion on February 7, 2012. Benjamin filed her reply on February 22, 2012.

Oral argument was heard on both Gurney's motion for summary judgment and Benjamin's motion to disqualify Gurney's counsel on March 7, 2012. On July 11, 2012, the Court conducted a telephone conference to address the motion to substitute non-party Kearney for defendant Bennett, as well as to address the proposed language of the declaratory judgment. On July 12, 2012, plaintiff's counsel submitted a letter confirming that Kearney is a resident of the State of New York. On July 13, 2012, plaintiff's counsel submitted proposed language for the declaratory judgment. On July 14, 2012, defendant's counsel submitted a response containing proposed language for the declaratory judgment.

The Court has fully considered the arguments of the parties.

## II. MOTION TO DISQUALIFY COUNSEL

### A.   Standard for Disqualification

Disqualification is viewed "with disfavor in this Circuit," *Bennett Silvershein Assocs. v. Furman*, 776 F. Supp. 800, 802 (S.D.N.Y. 1991), because it "impinges on parties' rights to employ the counsel of their choice." *Stratavest Ltd. v. Rogers*, 903 F.

Supp. 663, 666 (S.D.N.Y. 1995). In particular, the Second Circuit has noted the "high standard of proof" required for disqualification motions because, among other things, they are "often interposed for tactical reasons, and that even when made in the best faith, such motions inevitably cause delay." *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791-92 (2d Cir. 1983) (internal quotation marks omitted); *accord Gov't India v. Cook Indus., Inc.*, 569 F.2d 737, 739 (2d Cir. 1978).

Nevertheless, the disqualification of counsel "is a matter committed to the sound discretion of the district court." *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990). A federal court's power to disqualify an attorney derives from its "inherent power to 'preserve the integrity of the adversary process,'" *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (quoting *Bd. of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)), and "is only appropriate where allowing the representation to continue would pose 'a significant risk of trial taint.'" *Team Obsolete Ltd. v. A.H.R.M.A. Ltd.*, No. 01 CV 1574 (ILG)(RML), 2006 WL 2013471, at *3 (E.D.N.Y. July 18, 2006) (citing *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir. 1981)). In exercising this power, courts look for "general guidance" to the American Bar Association ("ABA") and state disciplinary rules, although the Second Circuit has emphasized that "not every violation of a disciplinary rule will necessarily lead to disqualification." *Hempstead Video, Inc.*, 409 F.3d at 132.[9] However, "any doubt is to

---

[9] The Court also notes that Civil Rule 1.5(b)(5) of the Local Rules of the U.S. District Courts for the Southern and Eastern Districts of New York binds attorneys appearing before those courts to the New York State Lawyer's Code of Professional Conduct. Local Civ. R. 1.5(b)(5); *see, e.g.*, *United States v. Hammad*, 846 F.2d 854, 857-58 (2d Cir. 1988);

be resolved in favor of disqualification." *See Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975); *see also Nichols v. Vill. Voice*, 99 Misc. 2d 822, 826, 417 N.Y.S.2d 415 (1979).

B.      Arguments for Disqualification

According to Benjamin, Gurney's counsel, Farrell Fritz, P.C. ("Farrell Fritz"), should be disqualified because "[f]or all practical purposes, Farrell Fritz is improperly engaged in the simultaneous representation of both Gurney's and the principal defendant director in the <u>Benjamin Action</u>[10] which seeks only derivative relief, <u>i.e.</u>, relief which benefits Gurney's . . . ." (Benjamin Brief in Support of Motion to Disqualify ("Benj. Br. Disq.") at 8.)[11] As set forth below, this Court concludes that Benjamin has not met the "high standard of proof" for disqualification of Farrell Fritz. *Evans*, 715 F.2d at 791.

Benjamin alleges that for all practical purposes, Farrell Fritz is representing both

---

*Polycast Tech. Corp. v. Uniroyal, Inc.*, 129 F.R.D. 621, 625 (S.D.N.Y. 1990) ("[I]n this Court federal law incorporates by reference the Code of Professional Responsibility.").

[10] The "Benjamin Action" refers to an action that was previously pending in the Southern District of New York and captioned *Benjamin v Carusona et al.* That was transferred to this Court on January 5, 2012, and was assigned docket number 11-cv-6120.

[11] Benjamin also asserts that Farrell Fritz should be disqualified because "[t]he two directors who retained Farrell Fritz were appointed by representatives of the purported Class B shareholders – who hold their shares invalidly." (Benj. Disq. Br. at 8.) As a threshold matter, the Class B shareholders are necessary parties to any ruling that would impact their equity or control rights. In any event, Benjamin has failed to demonstrate as part of this case that the Class B shares were improperly issued or void and, thus, this assertion does not provide a basis for disqualification. In fact, Benjamin is seeking to amend her second amended complaint in the Benjamin Action to, *inter alia*, add allegations that the Class B shares are invalid.

Gurney's and Carusona in this action. However, Benjamin concedes that Farrell Fritz at no time has appeared on the record in either the Benjamin Action or in this action for Carusona, but rather alleges that "[Farrell Fritz] is in fact representing Carusona's interests, which are adverse to the interests of Gurney's." (Benjamin Br. Disq. at 9.) Gurney's argues that this position is not only false but that it is barred by the doctrine of judicial estoppel. This Court agrees.

First, the doctrine of judicial estoppel provides that "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) (quotation marks and citation omitted). "[A] party invoking judicial estoppel must show that (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner, such as by rendering a favorable judgment." *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004) (internal quotation marks omitted).

In this case, Benjamin previously asserted that Gurney's and Carusona's positions were aligned and the Court subsequently denied plaintiff's motion for remand and adopted that position. *Gurney's Inn Resort & Spa Ltd. v. Benjamin*, 743 F. Supp. 2d 117, 124-25 (E.D.N.Y. 2010). As this Court stated in its earlier decision:

[B]enjamin contends that Carusona and Bennett should be parties in this

case but that their alignment in the case as codefendants with Benjamin is improper. (*See* Def.'s Opp. at 16-17; Notice of Removal ¶ 10.) The Court agrees. In this case, Gurney's is not acting as a neutral party merely seeking to resolve a conflict between deadlocked Board members in any way a court sees fit. Rather, in its complaint, Gurney's takes the specific position that a court "should issue a declaratory judgment that Benjamin, Carusona and Bennett have equal voting rights with respect to all matters presented to the Board of Directors." (Compl. ¶ 5 (emphasis added).) This position is directly contrary to Benjamin's position that she has the exclusive right to vote on certain issues, but in no way conflicts with Carusona's and Bennett's interests, which clearly are to secure their own voting rights as directors of the Board. (*See* Compl. ¶¶ 3-4 ("Benjamin has taken the erroneous position that she has the exclusive right to determine whether to reduce, change, modify or terminate services or expenditures at Gurney's and that Carusona and Bennett have no right to vote concerning such matters. However, Gurney's By-Laws and organizational documents plainly provide that Benjamin, Carusona and Bennett have equal voting rights. . . .").) Thus, Carusona's and Bennett's interests undoubtedly lie in Gurney's prevailing on this claim.

*Id*. Thus, Gurney's is correct that Benjamin is judicially estopped from taking the position that Gurney's and Carusona's interests are not aligned.

Moreover, Farrell Fritz does not, and has never, represented Carusona. In this action, Gurney's is represented by Farrell Fritz and Carusona is represented by Robert & Robert, LLP.   As correctly noted in Gurney's memorandum of law in opposition to the disqualification motion, Gurney's, Bennett and Carusona were jointly represented in the Benjamin action. (Gurney's Brief in Opposition to the Motion to Disqualify ("Gurney's Opp. Br. Disq.") at 9.) However, upon the advice of Farrell Fritz, Gurney's retained separate counsel in order to ensure that no conflict of interest issues would arise in this action or the Benjamin Action. (*Id*. (citing Exhibit "D" to Benjamin Decl., May 17, 2010 Minutes).)

Benjamin argues that, despite the fact that Farrell Fritz does not formally represent Carusona, it is essentially directing the litigation. (Benj. Br. Disq. at 7, 9.) Benjamin claims that:

> Farrell Fritz's retention as substitute counsel in the <u>Benjamin Action</u> was Carusona's idea. Carusona negotiated the Farrell Fritz retention agreement even before its retention was approved by Gurney's Board of directors (over Benjamin's objections) and he directs Farrell Fritz's litigation efforts. Equally telling, Farrell Fritz's billing for supposedly representing only a nominal defendant greatly exceed those of the firm representing the principal defendant.

(*Id*. at 9.) First, Benjamin's allegation that Carusona is directing the litigation efforts is conclusory. Although Benjamin attempts to point to the difference in legal fees between the two parties, as detailed in Gurney's memorandum in opposition, although Gurney's has been named as a nominal

defendant in the Benjamin action, it has had to oppose motions made by Benjamin in the Benjamin action and this action. (Gurney's Opp. Br. Disq. at 10-13.) Thus Benjamin's argument that Farrell Fritz should be disqualified because it is simultaneously representing Gurney's and Carusona fails.[12]

## II. SUMMARY JUDGMENT MOTION

### A.    Summary Judgment Standard

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original)). As the Supreme Court stated in *Anderso*n, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48, 106 S.Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.

---

[12] Gurney's also argues that Benjamin's simultaneous representation argument fails because Benjamin has relied on law relating to derivative actions that is not relevant in this case and that Benjamin has waived any alleged conflict of interest. (Gurney's Opp. Br. Disq. at 6-8, 12.) First, the Court agrees with Gurney's that the derivative action case authority are inapposite to the circumstances here because this is a declaratory judgment action, not a derivative suit. As to the waiver argument, because this Court has already determined that no conflict of interest exists, the Court need not address that issue.

1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

## B.     Applicable Law

New York law is clear that in a cooperative corporation, all operative corporate documents, including the offering plan, by-laws and proprietary lease, are "inseparably joined" and cannot be read "in isolation from one another." *See Fe Bland v. Two Trees Mgmt. Co.*, 66 N.Y.2d 556, 563 (1985) *superseded by statute on other grounds* N.Y. Bus. Corp. Law § 501(b); *see also Barbour v. Knecht*, 296 A.D.2d 218, 224, 743 N.Y.S.2d 483, 488 (App. Div. 2002) ("The relationship between the shareholders of a cooperative corporation and the corporation, as well as the extent of the authority of the board of directors, is determined by the certificate of incorporation, the by-laws and proprietary lease, which must be read together."); *1326 Apartments Corp. v. Barbosa*, 147 Misc. 2d 264, 267, 555 N.Y.S.2d 560, 562 (N.Y. City Civ. Ct. 1990) ("[t]he law is clear that all operative corporate and cooperative documents – offering plan, certificate of incorporation, lease and by-laws, are inseparably joined in determining the relationship of shareholder/tenants to a cooperative."). "Even as to such normal corporate matters as the authority of the board of directors, therefore, it is not just the bylaws that are determinative; the relevant provisions of the related documents must be read together." *Fe Bland*, 66 N.Y.2d 556, 563 (1985); *see also Barbour*, 296 A.D.2d at 223-24 ("But in determining matters of corporate governance documents should not be looked at in isolation"); *North Broadway

*Estates, Ltd. v. Schmoldt*, 147 Misc. 2d 1098, 1099-1100 (N.Y. City. Civ. Ct. 1990) ("The authority of the board to manage the cooperative and adopt rules to carry out its general purposes is derived from the corporation's articles of incorporation, bylaws and the proprietary lease subject to applicable statutory and decisional law. All of these documents must be examined to determine whether a particular action is within the board's inherent power.") Usual rules of contract interpretation apply to interpretation of the controlling documents of a cooperative corporation. *See Kralik v. 239 E. 79th St. Owners Corp*., 5 N.Y.3d 54, 59 (2005).

When interpreting potential conflicts in a cooperative's organizational documents, "as a matter of [New York] state law, the certificate of incorporation must take precedence over inconsistent bylaws." *136 East 56th Street Owners, Inc. v. Darnet Realty Associates, LLC.*, No. 98 CV 5864, 1999 WL 47328, at *4 (S.D.N.Y 1999). When there is a conflict between the bylaws and the proprietary lease, the bylaws control. *See Murphy v. 253 Garth Tenants Corp.*, 579 F. Supp. 1150, 1155-56. (S.D.N.Y. 1983). Moreover, when there is a conflict between the offering plan and any other document used in connection with the timeshare offering, the offering plan controls. *See* 13 NYCRR § 24.3(r)(14); *see, e.g.*, *210-220-230 Owners Corp. v. Arancio*, No SP-59-2009, 2009 WL 2356893, *11 (N.Y. Civ. Ct. July 21, 2009) ("[Respondent] principally relies upon paragraph 38 of the Proprietary Lease rather than the provisions of the Offering Plan – a reliance misplaced by virtue of the relationship and relative importance of the two documents and the explicit deference of the former to the latter."). If as a result of reviewing the controlling documents an ambiguity exists, "[t]he conduct of the

parties is the best evidence as to their meaning." *Barbour*, 296 A.D.2d at 224.

Moreover, for a company that has been reorganized in bankruptcy, "[a] confirmed plan of reorganization acts like a contract that is binding on all of the parties, debtor and creditors alike.'" *Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 80, 88 (S.D.N.Y. 2008.)

## C.     Application

Gurney's argues that viewing all of the corporate governance documents as a whole, it is clear that each member of the Board is entitled to one equal vote concerning all matters considered by the Board, including financial decisions and whether to increase, reduce, change, modify or terminate services or expenditures at Gurney's. Moreover, Gurney's argues that, based on the corporate governance documents, the Class A shareholders will not control the Board until the Class B shares are terminated. In opposition, relying on Section 3(e) of the Lease, Benjamin argues that the Class A director has the discretionary power to make certain decisions regarding services provided at Gurney's.[13]  For the reasons set forth below, the Court grants summary judgment in favor of Gurney's and concludes that, based on the cooperative governing documents, bankruptcy

reorganization documents and extrinsic evidence, it is clear and unambiguous that each member of the Board is entitled to one equal vote concerning all matters considered by the Board, including financial decisions and whether to increase, reduce, change, modify or terminate services or expenditures at Gurney's. Although Section 3(e) of the Lease appears to contradict the clear language of the other relevant documents, that provision cannot be read in isolation, but rather must be considered in conjunction the other cooperative governing documents. When the documents are all read together, there is no ambiguity and Gurney's interpretation is clearly correct. In any event, even assuming *arguendo* that Section 3(e) created some ambiguity that required consideration of extrinsic evidence, the uncontroverted extrinsic evidence also supports Gurney's interpretation.

### 1.     Gurney's Cooperative Governing Documents

Although Benjamin urges the Court to view Section 3(e) of the Lease in isolation, Gurney's cooperative governing documents are "inseparably joined" and must be read together. *See Fe Bland*, 66 N.Y.2d at 563. Viewing the governing documents together, it is clear that each member of the Board has one equal vote on all corporate matters and that the Class B directors maintain control of the Board until all of the mortgages are satisfied.

First, several provisions in Gurney's By-Laws clearly indicate that each Board member has one equal vote and that only a vote of the majority of the entire Board may bind the company. The By-Laws state, in pertinent part, that:

> At all meetings of the Board of Directors, each director shall be

---

[13] At oral argument, there was a disagreement over what services Benjamin is claiming to have control over pursuant to Section 3(e) of the Lease. Benjamin's attorney argued that Benjamin was not seeking control over Gurney's but over the services provided at Gurney's. Counsel for Gurney's, *inter alia*, pointed to certain instances where Benjamin sought to exercise control over matters other than services, for example expending money to pay legal fees, pursuant to Section 3(e) of the Lease. However, as discussed *supra*, because the Court finds that the corporate governance documents provide that each member of the Board is entitled to one equal vote on all matters, this disagreement is moot.

entitled to one vote. The vote of a majority of the Board of Directors present at the time of a vote of a duly constituted meeting shall be an act of the Board of Directors.

(Pl. Ex. 5, Art. III § 5.) Thus, Article III, Section 5 of the By-Laws supports Gurney's interpretation. More support is found for Gurney's position in Article 3, Section 7 of the By-Laws which state that:

> *Annual Cash Requirements:* The Board of Directors shall, except as may be otherwise restricted by the Interval Proprietary Lease of the Corporation, from time to time, determine the cash requirements as defined in the Corporation's proprietary leases, and fix the terms and manner of payment of rent under the Corporation's interval proprietary leases. The Board of Directors shall have discretionary power to prescribe the manner of maintaining and operating the resort accommodation of the Corporation and to determine the cash requirements of the Corporation to be paid as aforesaid by the interval shareholder-tenants under their respective interval proprietary leases. Every such determination by the Board of Directors shall be final and conclusive as to all interval shareholder-tenants and any expenditures made by the Corporation's officers or its agent under the director or with the approval of the Board of Directors of the Corporation shall, as against the interval shareholder-tenants be deemed necessarily and properly made for such purposes.

(Pl. Ex. 5, Art. III., § 7.) Thus, the plain language of the By-Laws provides that the Board, not solely the Class A director, shall have discretionary power to, *inter alia*, prescribe the manner of maintaining and operating the resort and determine the cash requirements for Gurney's.

In addition, Article II, Section 5, of the By-Laws supports Gurney's position that each of the Class B directors are entitled to a vote, and thereby control of the Board, until all mortgages are satisfied. As stated in Article II, Section 5:

> At each meeting of shareholders each Class A shareholder present in person or by proxy shall be entitled to one vote, and each Class B shareholder present in person or by proxy shall be entitled to one vote, for each share of either class registered in his name at the time of service of notice of such meetings or at such prior date . . . Class B shares shall be entitled to vote until all mortgages on the property of the Corporation at closing are paid and satisfied, including the purchase money mortgage given at the closing of the property to the Corporation.

(Pl. Ex. 5, Art. II, § 5.) Accordingly, Article II, Section 5 clearly indicates that the Class B shares shall be entitled to vote until all mortgages are satisfied.

Second, the Certificate of Amendment of the Certificate of Incorporation provides, in pertinent part, that:

> (b) The relative rights, preferences and limitations of the Class A shares and Class B shares shall be the same in all respects except as follows:

12

(i)    The holders of Class A shares shall be vested exclusively with the right to enter into interval proprietary leases with the Corporation for time-sharing interests in units of the Corporation's resort accommodations;

(ii)    The holders of the Class B shares shall be divested of all voting power in the Corporation upon (A) the sale of all time-sharing interest in units of the Corporation's resort accommodations; and the holders of Class A shares thereafter shall be vested exclusively with the voting power of the Corporation.

(Pl. Ex. 4, Art. IV(a).) Gurney's argues that, under the doctrine of *expressio unius est exclusio alterious*, the Court should infer from the enumeration of two specific differences between the Class A and Class B stock that the parties intended to excuse any other differences in those rights, including Benjamin's perceived right that the Class A shareholders control Gurney's finances. (Gurney's Memorandum in Support of Summary Judgment ("Pl. Br. SJ") at 6-7 (citing *IBM Poughkeepsie Employees Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*, 590 F. Supp. 769, 773 (S.D.N.Y. 1983).) "Under the doctrine of *expressio unius est exclusion alterious*, when certain persons or categories are specified in a contract, an intention to exclude all others may be inferred." *IBM Poughkeepsie Emps Fed. Credit Union*, 590 F. Supp. at 773. Thus, Gurney's is correct that this Certificate of Amendment of the Certificate of Incorporation supports Gurney's position that all directors on the Board would be entitled to one equal vote on all corporate matters.

In addition, provisions in the Offering Plan provide support for Gurney's position that the Board collectively determines Gurney's financial obligations and the governance of all corporate matters. First, on page 49 of the Offering Plan, it is clear that the Board, as opposed to the Class A director, fixes the maintenance charges for resort accommodations. (Pl. Ex. 6, p. 49.) As stated on page 49 of the Offering Plan, "As Interval Lessee, every shareholder of the Corporation will be obligated to pay the maintenance charges for his resort accommodations as fixed by the Board of Directors." (*Id.*)

Moreover, the Offering Plan clearly indicates, in several provisions, that the Class B shareholders shall retain control of the Board until all of the mortgages are satisfied. Page 3 of the Offering Plan provides that:

> [V]oting control will reside in initial directors and holders of specially issued Class B stock until all mortgages, including the purchase money mortgage given at closing, are paid and satisfied from the sale of the units as denoted herein. Purchasers of the units shall then have full voting control of the Corporation and the premises shall not be encumbered by any mortgage."

(*Id.* at 3.) Similarly, page 46 of the Offering Plan states:

13

NOTE: THE INSTITUTIONAL AND PURCHASE MONEY MORTGAGEES RESERVE THE RIGHT TO CONTROL AND/OR APPOINT A MAJORITY OF THE BOARD OF DIRECTORS OF THE COOPERATIVE CORPORATION UNTIL THEIR RESPECTIVE MORTGAGES ARE PAID OFF.

(*Id.* at 46 (emphasis in original).) Page 51 of the Offering Plan also provides that:

(THE INSTITUTIONAL AND PURCHASE MONEY MORTGAGES BY AGREEMENT RESERVED THE RIGHT TO CONTROL AND/OR APPOINT A MAJORITY OF THE BOARD OF DIRECTORS OF THE COOPERATIVE CORPORATION UNTIL THEIR RESPECTIVE MORTGAGES ARE PAID OFF). . . .

(*Id.* at 51 (emphasis in original).)  Page 52 of the Offering Plan provides:

When all mortgages . . . have been paid and satisfied, including the purchase money mortgage given at closing, the purchases of Class A stock shall have full voting control of the Corporation, the Class B stock will no longer have any voting rights, with all Class B stock being cancelled immediately after election of new board of directors by the Class A purchasers.

(*Id.* at 52.)  Thus, the Offering Plan clearly provides that all members of the Board are entitled to an equal vote and that the Class B shares shall maintain control of the Board until all mortgages are satisfied.

The only discrepancy that exists within Gurney's governing documents is found in Section 3(e) of the Lease, which is the document relied upon by Benjamin.  Section 3(e) of the Lease provides that:

The covenants by the INTERVAL LESSOR herein contained are subject, however, to the discretionary power of the Directors elected by Class A stockholders to determine from time to time what services and what attendance shall be proper in the manner of maintaining and operating the building and also what existing services shall be increased, reduced, changed, modified or terminated.  Notwithstanding the aforesaid, at all times, directors may condition availability of such facilities based on emergencies, strikes, non-accessibility, acts of God, or fiscal problems brought on by maintenance collection deficiencies.

(Pl. Ex. 7, § 3(e) (emphasis in original).) However, a nearly identical provision exists in the Offering Plan on page 50.  The Offering Plan Provides that:

The covenants by the Interval Lessor herein contained are subject, however, to the discretionary power of the Directors to determine from time to time what services and what attendance shall be proper in the manner of maintaining and operating the building and also what existing services shall be increased, changed or modified or terminated.

(Pl. Ex. 6, at 50.)  Gurney's argues that the discrepancy between the provision in the Offering Plan and the nearly identical provision in the Lease creates an internal

14

conflict that must be construed against the Lease.  (Gurney's Reply Brief in Support of the Motion for Summary Judgment ("Pl. Reply Br. SJ") at 4.)  Benjamin argues that "there are no inconsistencies among Gurney's corporate documents, at least insofar as the subject matter of Section 3(e) is concerned."  (Ben. SJ Opp. Br. at 5.)  However, Benjamin's position is completely at odds with New York law that clearly establishes that cooperative governing documents cannot be looked at in isolation.  *See Fe Bland*, 66 N.Y.2d at 563; *Barbour v. Knecht*, 296 A.D.2d at 224.  Thus, the Court must look at all of the governing cooperative documents.  When looking at the cooperative governing documents, the provision in Section 3(e) of Lease is not only at odds with the Offering Plan, but it is also at odds with the By-Laws and the First Amendment to the Certificate of Incorporation.  As detailed *supra*, the By-Laws, Amendment to the Certificate of Incorporation and the Offering Plan contain numerous provisions that provide that all directors on the Board, not just the Class A director, have the power to vote as a majority on all matters of corporate governance, including services and maintenance, and that the Class B shares will no longer have control once all of the mortgages have been satisfied.  Moreover, this construction of the documents comports with New York law.  *See* 13 NYCRR § 24.3(r)(14); *see, e.g.*, *210-220-230 Owners Corp.*, 2009 WL 2356893, at *11-12 ("Indeed, in view of the fact that the determination of whether a particular shareholder is a holder of unsold shares will potentially adversely affect other apartment owners/shareholders by depriving them, through their elected board, of influence over who will or will not purchase or reside in such apartment, it is fitting that the Court look to the document that created and governs a broader set of relationships, the

Offering Plan, as opposed to the binary Proprietary Lease.").

In addition, at oral argument, Benjamin argued that the language in the Offering Plan may be a typo, or is incomplete as opposed to inconsistent. However, Benjamin failed to provide any legal or factual basis for this assertion.  Benjamin also argued that the provision of the Offering Plan on page 50 was under a section titled "Summary of Some Terms of Interval Proprietary Lease" and thus, a summary should not be given more weight than the Lease itself.  However, Benjamin did not provide any support for his position that a summary in the Offering Plan should be given less weight than a provision in a Lease.  In addition, Benjamin has also failed to explain the discrepancy between Section 3(e) and the other governing documents cited to *supra*.

Benjamin also argues that the Court must read the two provisions, Section 3(e) of the Lease and page 50 of the Offering Plan, together,  to the extent possible, in order to give both effect.  (Benj. SJ Opp. Br. at 11. (citing *Perlbinder v. Bd. of Mgrs.*, 65 A.D.3d 985, 987 (N.Y. App. Div. 2009).  However, Benjamin fails to provide any interpretation of the two provisions that would allow both provisions to be read together.  Instead, he reads the provision of 3(e) of the Lease, without consulting any other document.  On the other hand, the construction put forth by Gurney's resolves the conflict because the provisions of 3(e) would become effective once the mortgages are satisfied.  Thus, the governing documents support the interpretation set forth by Gurney's.

It should also be noted that within the Lease itself there are several provisions that support the interpretation that all of the directors on the Board have one equal vote.

15

For example, Section 1(c) of the Lease provides that:

> "Cash requirements," whenever used herein shall mean the estimated amount in cash which the Directors shall from time to time in their judgment determine to be necessary or proper for (1) the operation, maintenance, care, alteration and improvement of the corporate property during the year or portion of the year for which such determination is made; (2) the creation of such reserve for contingencies as it may deem proper; and (3) the payment of any obligations, liabilities or expenses incurred or to be incurred, after given consideration to (i) income expected to be received during such period (other than rent from interval proprietary lessees), and (ii) cash on hand which the Directors in their discretion may choose to apply. The Directors may from time to time modify their prior determination and increase or diminish the amount previously determined as cash requirements of the corporation for a year or portion thereof . . . all determinations of cash requirements shall be conclusive as to all interval Lessees.

(Pl. Ex. 7, §1 (c).)  In addition, the Lease further provides that "the Directors may from time to time as may be proper determine how much of the maintenance and other receipts when received . . . shall be credited on the corporate accounts to 'Paid-in Surplus.'" (*Id* § 1(f).)  Morever, Section 1(h) states, "In addition to maintenance/rent the directors shall fix annually a per diem charge for occupancy of the resort accommodations." (*Id*. at § 1(h).)

Thus, apart from the one subsection cited by plaintiff, the Lease also indicates that all of the Board, not merely the Class A Director, are to have equal voting power on matters of cooperative governance. Moreover, based on the Lease, Offering Plan, By-Laws, and Certificate of Amendment of the Certificate of Incorporation, it is clear that all members of the Board are entitled to an equal vote and that the Class B directors maintain control until their shares are terminated.

2.    Reorganization in Bankruptcy

As noted *supra*, Gurney's is a reorganized company.  Gurney's argues that, in addition to the cooperative governing documents, Gurney's bankruptcy documents, which are binding and controlling, also support the position that all members of the Board have one equal vote and that the Class B shares have control until their shares are terminated. Benjamin argues that the Bankruptcy documents are not binding on the timeshare owners and, to the extent they are, do not reflect the intent of the parties.  As set forth below, the Court agrees with Gurney's.

a.    Binding Effect on Class A Shareholders

Benjamin's argument that the bankruptcy documents are not binding on the timeshare owners is without merit. Benjamin tries to argue that the timeshare owners "were not represented in the bankruptcy proceeding nor did they vote on Gurney's plan of reorganization nor were they kept apprised of the process of the bankruptcy proceeding." (Benj. SJ Opp. Br. at 18.)  In addition, at oral argument, for the first time, Benjamin argued that since Section 11 of the Order Confirming the Plan of Reorganization (the "Order") provides

16

that "The First Amended Plan of Reorganization shall be binding upon Limited and any entity acquiring property under the First Amended Plan or any entity to which property is tendered . . .," (Pl. Ex. 12, ¶ 11), and the timeshare owners did not acquire or tender property, the Order and the Plan are not binding on them.  Not only has Gurney's provided extensive documentation of the notice provided the Class A shareholders in this proceeding as well as in the bankruptcy proceedings, (*See* Montemarano Decl, Ex. 1-11), but as noted by Gurney's counsel at oral argument, the Class A shareholders received a position on the Board in bankruptcy.  In addition, as stated *supra*, a bankruptcy plan of reorganization is "a contract that is binding on all of the parties, debtor and creditors alike," *Adelphia Recovery Trust*, 390 B.R. at 80, and "a bankruptcy court's order confirming a plan of reorganization constitutes a final judgment with preclusive effect under res judicata." *In re Layo*, 460 F.3d 289, 294 (2d Cir. 2006).

However, even if the bankruptcy documents were not binding on the Class A shareholders, based on the overwhelming evidence in Gurney's cooperative governing documents, as discussed *supra*, and the uncontroverted extrinsic evidence, as discussed *infra*, the Court would still find that all members of the Board have an equal vote and that the Class B shareholders maintain control of the Board until their shares are terminated.

b.    Bankruptcy Documents

In addition to the governing documents discussed *supra*, Gurney's bankruptcy documents also support the interpretation that each member of the Board, not just the Class A director, can make decisions on cooperate governance issues.

First, as discussed *supra*, during the reorganization of Gurney's, Gurney's and the Trust entered into a Stipulation of Settlement.  (Pl. 56.1 ¶ 32.)  In the Stipulation of Settlement, the:

Trust agree[d] to amend Limited's Offering Plan and Bylaws as follows:  (a) Article III, Section 2 of the Bylaws of Limited will provide that one seat on the Board of Directors of Limited shall be elected by majority vote of the Class A Shareholders in attendance at the annual meeting of Shareholders, or at any special meeting of Shareholders, conveyed for that purpose.  The remaining two seats, shall be elected by Majority vote of all Class B and Class A Shareholders, of which all Class B Shares are owned by the Liquidating Trust, possessing control of the vote; (b) Paragraph "N" of the Offering Plan to provide that only the purchase money mortgagee may appoint and control the Board of Directors of Limited until the purchase money mortgage is paid in full.

(Pl. Ex. 10, ¶ 8.)  Accordingly, the Stipulation of Settlement also supports the interpretation that the Class B shareholders would continue to control the Board until the purchase money mortgage is satisfied.

In addition, the First Amended Plan of Reorganization provides in Article VI, Section 6.2(b) that:

Article III, Section 2 of the Bylaws of Limited is amended to provide that one seat on the Board of Directors of Limited shall be elected by majority vote of the Class A Shareholders in attendance at the

annual meeting of Shareholders, or at any special meeting of Shareholders conveyed for that purpose. With the exception of the Class A Shareholder member of the Board of Directors, all other Directors of the Board of Directors shall be appointed by the Purchase Money Mortgagee, until the Purchase Money Mortgage (as modified and restated) is paid in full.

(Pl. Ex. 11, Art.VI, § 6.2(b).) Thus, the First Amended Plan of Reorganization expressly provides that the Class B Directors shall continue to control the Board until the purchase money mortgage is paid in full.

Moreover, the Order Confirming the First Amendment Plan of Reorganization provides that:

The First Amended Plan and its provisions shall be binding upon Limited and any entity acquiring property under the First Amended Plan or any entity to which property is tendered under the First Amended Plan, whether or not the claim of or interest of the creditor or equity holder is impaired under the First Amended Plan and whether or not such creditor or equity holder has accepted the First Amended Plan.

(Pl. Ex. 12, § 11). Thus, as explicitly stated in the Order, the Plan is binding on Gurney's and Benjamin. Accordingly, like the cooperative governing documents, the Bankruptcy documents also support Gurney's position that each member of the Board is entitled to one vote until the purchase money mortgage is satisfied.

3.     Extrinsic Evidence

As stated *supra*, when an ambiguity in the document exists, the Court may look to extrinsic evidence to determine the parties' intent. *Barbour*, 296 A.D.2d at 224. Although the cooperative documents and the bankruptcy documents (when read together) unambiguously support Gurney's interpretation and resort to extrinsic evidence is unnecessary, the result would be the same even if the Court had to resort to extrinsic evidence. In other words, even assuming *arguendo* that there is an ambiguity (because of Lease Section 3(e)) that requires consideration of extrinsic evidence, the uncontroverted extrinsic evidence provided fully supports Gurney's position such that summary judgment in Gurney's favor would still be warranted.[14]

Benjamin has not pointed to any extrinsic evidence to support her argument either in her opposition papers or at oral argument.[15] On the other hand, Gurney's

---

[14] Benjamin argues that, according to the rule of *contra proferentum*, ambiguities must be construed against the drafter, and thus, the ambiguity must be construed in favor of the Class A shareholders and directors. (Benj. SJ. Opp. Br. at 24 (citing *151 W. Assocs. v. Printsiples Fabric Corp.*, 61 N.Y.2d 732 (1984)).) However, as noted by Gurney's in its reply, the Court should look to extrinsic evidence to determine the parties' intent before resorting to the doctrine of *contra proferentum*. (Pl. Reply Br. SJ at 9 (citing *M. Fortunoff of Westbury Corp. v. Peerless Ins. Co.*, 432 F.3d 127, 142 (2d Cir. 2005).) As set forth at length *infra*, the uncontroverted extrinsic evidence provided by Gurney's clearly establishes Gurney's intent to give all of the directors on the Board an equal vote and for the Class B directors to maintain control until their shares are terminated. Thus, there is no need to apply the rule of *contra proferentum*.

[15] By letter dated March 8, 2012, Benjamin's attorney submitted a letter indicating that Leggio does not reside outside of the Court's jurisdiction because while he is wintering in Florida, he retains a residence in Eastport. (ECF. No. 58.) However, this information has no effect on this Court's decision.

points to (1) the opinion of the draftsman of the Lease; (2) the opinion of the draftsman of Gurney's Bankruptcy Reorganization plan; and (3) the parties course of performance.

When there is an internal conflict between interrelated agreements, extrinsic evidence of the drafters' intent is admissible. *See, e.g., Samba Enters., LLC v. iMesh, Inc.*, No. 06 Civ. 7660 (DC), 2009 WL 705537, *8 n.5 (S.D.N.Y Mar. 19, 2009). In this case, Gurney's has provided an affidavit from Clurman, the attorney that drafted Gurney's Offering Plan, Lease, and other documents. (Clurman Decl. ¶¶ 14, 19-23.) In Clurman's Declaration, and at Clurman's deposition, Clurman testified that his intent and the intent of the parties at the time of drafting Section 3(e) of the Lease was that the Lease was not to become effective until the Class B shareholders' mortgages were paid off with the proceeds of the timeshare offerings, at which time Gurney's Class B shares were terminated and the timeshare owners owned Gurney's free and clear of the Class B shareholders' interest. (Clurman Decl. ¶ 35, Pl. Ex. 13, Clurman Dep. 128:19-133:08.)

Gurney's has also provided the declaration of Randolph White, Esq. ("White"), one of the attorneys that represented Gurney's during its bankruptcy reorganization. (White Decl., ¶ 6.) According to White, the Plan was not intended to alter the overall cooperate structure of Gurneys and the Class A shares were only being given a spot on the Board. (*Id.*, ¶¶ 13, 20.) Moreover, according to White, all decisions were to remain subject to the decision of the Board, and control of the Board was in the hands of the Class B shares until the Trust's mortgage was satisfied in full. (*Id.* ¶ 20.) Accordingly, the decisions of the drafters of the Offering

Plan, Lease and Reorganization documents have provided opinions that support Gurney's interpretation of the documents.

Moreover, Gurney's thirteen-year course of performance provides clear evidence of the parties' intent. It is well settled that '[i]ntent can be gleaned from many sources, including . . . the manner in which the provision has been applied in practice over time." *Congregation Yetev Lev D'Satmar, Inc. v. Kahana*, 31 A.D.3d 541, 548-49 (N.Y. App. Div. 2006), *aff'd* 9 N.Y.3d 282 (2007); *see also Soberman v. Groff Studios Corp.*, No. 99-cv-1005 (DLC), 2000 WL 328781, at *6 (S.D.N.Y Mar. 28, 2000) ("In this case, it is determinative that the parties conducted themselves according to the same understanding of the Lease for sixteen years, as the parties' course of performance under the contract is considered to be the most persuasive evidence of the agreed intention of the parties (internal citations omitted)).

In the case at bar, Benjamin's predecessor, Leggio, served as the Class A director from 1996 until 2009 when Benjamin was elected. However, during that time period, Leggio never invoked authority from 3(e) of the Lease in order to make unilateral decisions regarding services or finances.[16] (Montemarano Dec. 25-27.) Thus, the parties' course of performance also supports the position that each member of the Board has one equal vote and that Section 3(e) of the Lease does not give Benjamin as Class A director complete

---

[16] Benjamin does not dispute that Leggio did not invoke authority from 3(e) of the Lease. Instead, Benjamin argues that the Court should not look to extrinsic evidence because Section 3(e) unambiguously supports her position. (Benj. SJ Opp. Br. at 22-24.) However, as discussed *supra*, the court concludes that Section 3(e), when read in conjunction with the corporate governance documents and bankruptcy documents, unambiguously supports Gurney's position, not Benjamin's interpretation.

control over services, finances or any other matter of cooperative governance of Gurney's.

In sum, the cooperate governance documents, the bankruptcy documents, and the extrinsic evidence all support Gurney's position that the Class B shares maintain control over the Board until their shares are terminated. No rational trier of fact could conclude otherwise. Thus, plaintiff is entitled to summary judgment.

## IV. LANGUAGE OF THE DECLARATORY JUDGMENT

Following oral argument, the Court asked for additional submissions on the language of the declaratory judgment. Having carefully reviewed those submissions, as well as the various corporate governance documents and bankruptcy documents, the Court concludes that the defendant's proposed language should be utilized.[17]

Plaintiff proposes that broader language be used in the declaratory judgment that allows each director to have one, equal vote "until the Class B shares are cancelled in accordance with the terms of Gurney's corporate documents and agreements." (Wick's July 13, 2012 Letter, at 1, ECF No. 62.) However, to avoid any future conflict on this issue, the Court concludes that it is more prudent to track the specific language of the relevant documents. As discussed *supra*, the By-Laws and the Offering Plan both make clear that the Class B shares are entitled to vote until all the mortgages of the property are paid and satisfied. However, the language of the Bankruptcy Stipulation

of Settlement and Article 6.2(b) of the First Amended Plan of Reorganization is more narrow – namely, the Class B directors are entitled to continue to vote until the purchase money mortgage is paid in full. Given the language of the bankruptcy documents, the Court concludes that the "one, equal vote" declaration should remain in effect, as defendant suggests, until the Monemarano/Cooper Trust's mortgage (*i.e.*, the purchase money mortgage) is paid in full.

---

[17]   To the extent that defendant also seeks in that letter to re-argue the merits of their interpretation of the relevant documents, the Court rejects those arguments for all the reasons discussed *supra*.

V. CONCLUSION

For the reasons set forth herein, Benjamin's motion to disqualify Gurney's counsel is denied and the motion to amend the complaint to substitute non-party John Kearney as defendant in place of Bennett is granted (and Kearney is re-aligned as a plaintiff).

Moreover, for the reasons set forth herein, plaintiff's motion for summary judgment is granted. Thus, judgment shall issue declaring that each member of Gurney's Board of Directors, including defendant Linda Benjamin, has one, equal vote concerning all matters considered by the Board, including financial decisions and whether to increase, reduce, change, modify or terminate services or expenditures at Gurney's, until the Montemarano/Cooper Trust's mortgage (*i.e.*, the purchase money mortgage) is paid in full. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: July 20, 2012
Central Islip, NY

\* \* \*

Gurney's Inn Resort & Spa, Ltd. is represented by Franklin C. McRoberts, Esq., and James M. Wicks, Esq., of Farrell Fritz, P.C., 1320 RexCorp Plaza, Uniondale, New York, 11556. Linda Benjamin is represented by Daniella Quitt, Esq. and Joel Carl Feffer of Harwood Feffer, LLP, 488 Madison Avenue, Suite 801, New York, NY 10022. Thomas Carusona is being represented by Clifford S. Robert, Esq. of Robert & Robert, LLP, 150 Broad Hollow Road, Melville, NY 11747.

21